I'd like to reserve some of my time at the end for rebuttal. Also, the first thing I want to turn to is the District Court's imposition of an enhancement under Section 3C.1.1 for obstruction of justice. Section 3C.1.1 provides for a two-level increase if the defendant willfully obstructed or impeded or attempted to instruct or impede the administration of justice. Now, one of the enumerated examples of such obstruction is escape. And in this case, the District Court apparently applied the instruction with the enhancement without looking at this Court's law, which clearly requires a mens rea element of the enhancement. This Court has held that 3C.1.1 requires that the defendant consciously act with the purpose of obstructing justice. As this Court has said, it contains a clear mens rea requirement that limits its scope to those who willfully obstruct or attempt to obstruct the administration of justice. It requires that the defendant consciously act with the purpose of obstructing justice. Ginsburg. Did the District Court make a finding on that issue, factual finding? No, Your Honor. What happened was that it wasn't objected to. And I think everyone just assumed that because it was one of the enumerated examples, the enhancement applied. Well, I'm wondering whether it really was an escape. I mean, he went to his home where he was found. It's not like he fled the jurisdiction. I mean, do we have cases that describe what an escape is? Well, I think, Your Honor, it's correct. I think that in this case there's so much more because he was dealing with an unimaginable grief, the loss of his wife. And he went home to be at the place that they had lived together. And I think that there is a mens rea requirement. And what happened in the argument was that defense counsel said, I respectfully submit to the Court that when someone goes to a hospital and their wife of 41 years passes away in front of their eyes, it's tough to imagine what mental state that person has at that point. And the courts responded, I don't disagree with that. In other words, the Court is saying we can't imagine what was going through the mind of this man who was suffering an unimaginable loss. And the Court then did not reach the issue that this Court has said is reversible error not to reach, which is, did he act with a specific purpose of instructing leave, or was he dealing with a catastrophic loss and simply returning to the place where he had lived with the woman that he had just lost? Counsel, doesn't it also include obstructing justice, absconding from pretrial release? Didn't he remove the electronic monitoring device that was secured to him? Didn't he fail to surrender at the time required as ordered? Didn't he fail to respond to the pretrial officer's attempt to contact him? Your Honor, those are correct. Although, I don't know if you got, there's no evidence that he got the call, but it's true that he did cut off the bracelet and didn't respond. But the point is, I think, that this Court has said if you don't look at mens rea, if you don't find that they act with a specific intent of obstructing justice, when they take those actions, it's reversible. And in those cases, that finding was never made here, because people assumed that simply because he had cut off the bracelet, that was an obstruct of justice. But it's not. You have to look at the intent. Why did he do it? Did he do it because he wanted to obstruct justice, or did he do it because he was dealing with an overwhelming grief and was actually contemplating killing himself? There's evidence in the record that he had lost his mind, that he was not in his normal mind, that he was thinking of killing himself, that he was contemplating suicide. He had just lost the only person he had ever been close to that meant everything to him. They had been together for 41 years. They were college sweethearts. He was dealing with a life-altering catastrophic event in the only way he knew how, which was to return to where they had been. And the Court never made the finding. What was his intent? What was his mens rea? And so it's not enough to say that he cut off the bracelet. The case, this Court's law, says we have to look at what was in his mind when he did that. Why did he do it? And this Court has reversed cases where the judge said, the defendant knowingly or not did something, or the Court said, I only lost to figure out what his intent was. And that's essentially what the Court did in this case. Defense counsel said, we can't imagine what this man was suffering. And the district court said, I don't disagree with you. We don't know what it was in his mind. And the Court never, I think the Court never realized it had to make the finding. It had to find that there was a specific intent to obstruct justice. It couldn't just say he was going through unimaginable suffering. We don't know what was going on, so I'm going to impose an enhancement. So he was, is it correct that the district court released him to see his wife and placed him on electronic monitoring and ordered him to either go to his residence or to the hospital? Those were the two places he was? That's correct. And what happened was he was supposed to report at 2 o'clock on where he was supposed to report. That's where he cut off his bracelet. And that's the evidence. And then he returned home, where his wife had been. His wife died on Sunday, and on Monday when he was supposed to return, at some point close to the office, he cut off the bracelet, and then he returned home. Well, he was ordered to self-surrender by 2 o'clock when he cut off his bracelet at 14 minutes before he was supposed to self-surrender. Could the district court have made the finding that he did that with the intent? You know, I think that's what the district court was required to do. But I think the evidence was undisputed. The only evidence was the evidence presented by the defense that he was not in his normal mind, that he was out of his mind, that he was planning to kill himself, that he was trying to decide how to kill himself. That's the only evidence about his state of mind. Given that the district court sentenced him to 72 months, and when the calculation of the range, including the two points for the obstruction of justice, was 97 to 102 months, if there was error by not making the correct factual finding, was that harmless error? No, Your Honor. I think what happened was the district court said, I'm not going to apply the computer enhancement. That's a two-level enhancement. That's excessive, the court said. Then the court said, I'm going to give you a little bit on the mitigation on the obstruction enhancement. And so you start out with 97 months. If you delete the two-level computer enhancement, that gets you down to 78 months. And then he apparently gave him six months off for the mitigation on the obstruction. If he had deleted the two-level obstruction enhancement, we would have been down to 63 months. Yes, but you would have been down to 63 to 78, and the 72-month sentence falls right in the middle of that. It does, but I think the district court was clearly looking at the low end of all of those ranges. What do you base that on? I just think the district court was looking at the low end. I'm sorry, Your Honor. The argument you're making this morning, did you make that argument before the district court? At the district court, the objection was not challenged. The enhancement was not challenged. I think everyone assumed that because it was one of the enumerated examples, it fell within the enhancement. But I'm arguing now that it's plain error because the law is clear. The district court was required to make a mens rea finding. And in the Thomas Hamilton case, on a plain error standard, a manifest injustice, they overturned the enhancement. And also I think where there's a guideline error, and there's an error in the calculation of the guidelines. By imposing the enhancement, there's an error in the calculation of the guidelines, and that constitutes plain error. Try to talk a little slower. I'm so sorry, Your Honor. It's all right. Everybody's in a hurry. No, I'm so sorry, Your Honor. It's funny. The whole world's in a hurry. No. So your best case, again, is? Well, the best cases, I think, would be the Gardner cases and the Thomas Hamilton case that are cited in the briefs. And I think all these cases say there is a mens rea requirement. The district court has to make a finding of a specific purpose. The first case is Gardner? The Gardner case and the Thomas Hamilton case that's cited in Gardner. Yeah. And if there's no further questions, I'd like to reserve some of my time for rebuttal. Fine. Thank you, Your Honor. Thank you. Thank you. May it please the court, Robin Bacon on behalf of the United States. Before getting into any of the legal issues raised, I'd like to just clarify some facts for the record regarding the exact sequence of events. On April 27th, 2011, the defendant was released by order of the magistrate judge to allow him to see his wife, who at that point had been hospitalized and whose condition appeared to be terminal. He was ordered to return on April 30th and also ordered to wear a location monitoring device the whole time he was on release. He was supposed to return at 2 p.m. At 1.45, defendant cut his bracelet and his whereabouts remained unknown until May 15th. So this is not a situation in which defendant cut his bracelet and Well, so, you know, that's the part I can't fathom because he was ordered restricted to his residence or the hospital. The wife dies or the wife or his partner dies and he goes to his residence. How come the U.S. Marshals couldn't find him at his residence? Did they go to his residence? Yes, Your Honor. A warrant was issued on the 30th. Attempts were made to locate him at his home. Frankly, there's no information in the record at all about his whereabouts between April 30th and May 15th. He was found at his residence. He was found at his residence on May 15th. But between So you made no record of whether he was at his residence or not at his In the record before this court, all evidence indicates that no one knows where he was between April 30th and May 15th. However, But we do know that his mental state included suicidal thoughts. That's in the record. Well, Your Honor, that information was conveyed by his brother after his arrest. In fact, the only indication of his suicidal inclinations was his brother telling that to the probation office in the PSR. Well, what's wrong with relying on the brother's statement? It's in the record. It's in the PSR. It's not contested. And there's no dispute that he was undoubtedly in a very, very He was facing a very difficult set of circumstances. This man had So no criminal history, right? Right. Okay. Never before had he been arrested for anything. All of a sudden, his life is falling apart for him, given the computer images and the amount of them. And, you know, he's he's the rest have been indicted. And his partner of almost 50 years dies. And I don't know. I mean, I would want to get more evidence and see if he really had the specific intent to to escape or to obstruct justice when he did those acts or whether he was just kind of crazy. I mean, I can see how someone who I mean, he did. He wasn't found in Mexico. No, Your Honor. He wasn't. But efforts were made to locate him. You agree. This is a specific intent matter to you. I agree that in order for the enhancement to apply, there has to be an intent to escape justice. I would also submit that there is a difference between somebody going through an emotionally difficult time, which, frankly, is not uncommon for a defendant who's also facing a likely prison sentence. But his wife died. Yes, sir. His wife died. And that was certainly a sad circumstance. It's more than it's more than sad for him. Yes, Your Honor. But it's got to be devastating. Quite frankly, Your Honor, I the district court recognized the devastating impact of the loss of his wife. I believe even I commented on it in sentencing. None of that relates to his decision to cut his bracelet, failed to report and remain abroad. How could it not relate? How could it not have impacted any decision he was making during that time? When I've had close people close to me, my mother, father, grandmother, passed away, the first advice I've gotten from any friend was don't make a decision for a year. Don't make a decision for a year. It's too hard. That is absolutely true, Your Honor. And there is nothing that suggests that this wasn't taken into account. Judge King was very clear. Well, show me where he made the specific factual finding of specific intent. There was never a discussion of specific intent below, Your Honor. It was not raised by the defense. So Judge King did not specifically address the issue. On the record, pages 28 and 29 of the transcript from the sentencing proceeding, he discusses the application of the plus 2 enhancement under the guidelines. But he also makes it very clear that the specific circumstances surrounding the decision not to return to custody warranted mitigation. Do you think the judge was aware that he was dealing with a specific intent matter? There was no discussion of the specific intent requirement, Your Honor, so I don't Nothing came up about that. It was not raised, Your Honor, but there is certainly a specific intent. So there was no discussion of this below. So I don't know if Judge King was familiar with the specific intent requirement, but I do know that there was also nothing to suggest that Judge King believed this was a strict liability situation as well. I mean, this was an issue that was briefed and discussed in both the PSR and the government sentencing position, and the defense specifically declined to offer any counterargument or counterinformation. So the question before the court was a two-part question. One question was whether under the guidelines, cutting an electronic monitoring bracelet and remaining abroad for two weeks, and this was a time period in which there are protocols. What efforts were made to locate him? A warrant was issued on the 30th, and the U.S. Marshals made attempts over the next two weeks to locate him. What attempts did they make? They went to his house on multiple occasions. They spoke to his family members on multiple occasions. How many occasions are multiple occasions? Is this in the record? The fact that they went to his house on multiple occasions I don't believe is in the record. It was discussed at one of the hearings. I mean, I don't see how we can consider that. I agree, Your Honor. I was just answering Judge Peterson's question. Well, they were told they went there on multiple occasions, but there's nothing in the record to support that. The record before the court did not include specific details about the attempts to find him. Okay. So I'm looking at the PSR and on the adjustment for obstruction of justice, paragraph 37. And the only thing that is written by the probation office to support that is Wuerffel was released from custody in order to self-surrender on April 30. Instead, Wuerffel removed his location monitoring device on April 30, and his whereabouts remained unknown to the PSA. Who's the PSA? That would be the Pretrial Services Administration. Okay. So it remained unknown to the Pretrial Services Administration until Wuerffel was arrested at his home on May 15. So what do we take from remained unknown to the PSA? That doesn't say that they – that sounds pretty passive. It doesn't say despite efforts to contact him and going to his house. That's true, Your Honor. However, it would be – frankly, it would be unreasonable for people who were trying to locate someone who is a convicted – someone who had admitted to a federal crime and was expected to report and was expected to be sentenced for a federal crime to make no effort to locate him during that 15 days. So what I find really odd is that, I mean, if I were – and I've been a district court judge, and I was supposed to sentence someone, and someone brought it to my attention that he didn't appear, why wouldn't you just order the marshals to go find him and serve a warrant on him to – if you really believed he had escaped? Your Honor, that's actually what happened. You'll see in the material submitted under seal that the April 30th letter from Pretrial Services to the magistrate, because the district court had, in fact, deferred this matter to the magistrate, and that's in the docket. On April 30th – What do you mean, deferred it to the magistrate? All of the issues regarding the defendant's release, including the emergency release on April 27th, 2012, so that he could see his wife, were presented to the magistrate judge, Magistrate Judge Nagel, rather than to the district court. It says that the defendant appeared in an emergency hearing before Your Honor and was granted release, and that was addressed – no, I guess that was addressed to Carla Worley, so I guess that's right. I apologize. Judge Worley. Judge Worley. And in addition to – She's a district court judge. No, Your Honor, she's a magistrate court judge. She was the magistrate judge who had made all of the prior decisions regarding defendant's multiple violations of the terms of his pretrial release. Defendant had actually already been ordered detained because he violated the terms of his pretrial release when information came up that his wife was in serious condition, at which point the magistrate judge then ordered him released so that he could see his wife with the condition that he self-surrender. The day that he failed to self-surrender – and this is attached to the pretrial services letter – the magistrate judge signed a warrant for his arrest. So that very day, April 30th, a warrant was issued to arrest him. And as far as the district court was concerned, the statement that his whereabouts remained unknown for 15 days was taking into consideration that upon issuing an arrest, the United States marshals would have been tasked with finding someone who at that point was categorized as a fugitive and bringing him back in. He wasn't found in his home. You're assuming that the marshals went out there, are you? Well, what I can say is that there is no information in the record on this question. I can also answer your question by saying that the marshals did, in fact, go to his house during the intervening period, but that was not in the record before the district court. The record before the district court did not include any details about the efforts made to find the defendant. The district court simply was informed that he was eventually located in his home, and there was no information to indicate where he was. All of this could be argued at some point, I suppose. But what do we do about the fact that the district court judge did not make a specific finding? We look to the record that was before the judge, and although it's not a strict liability offense in the sense that anyone who fails to appear for a court date  certainly contained enough information for the court to conclude that the defendant had demonstrated the necessary intent. And all of the issues about whether or not he had the mental capacity to form that intent were not raised below. They've actually only been raised on appeal. So the district court could not be said to have committed error not to ask further questions when issues were not in dispute. It's about making the finding. He has to make the finding, right? The finding that the district court made was that he did, in fact, attempt to obstruct justice by escaping from custody, and that was the point at which the district court said that the two-level enhancement should apply. The district court's record, as far as the discussion of the enhancement, there was a lot of discussion of it in terms of aggravation and mitigation. But in terms of the guideline enhancement, it was a fairly straightforward conclusion that the guideline enhancement should apply that was not objected to and that was based on the information presented before the court, which included no information that this defendant was incapable of forming that intent. He may have had very good reasons for not wanting to return to custody, and I believe Judge King did recognize those reasons on the record. This was certainly an understandable and an easy-to-explain set of circumstances, but for purposes of a guideline calculation, Judge King indicated that that was not an excuse. The enhancement should apply, but in terms of the sentence under 3553A, all of the other considerations, such as his grief and his emotional state and this particularly terrible set of circumstances where he both lost his wife and was going to be sentenced for a federal crime, should be taken into consideration. And I think that's reflected in the fact that his ultimate sentence is lower than what his guideline sentence would have been, even without the two-level enhancement. The court was taking into account the full picture, but there was no specific detailed set of findings regarding this enhancement for the simple reason that based on the information before the court, there was no need to provide a detailed discussion of it. There was no dispute. It was barely discussed at the hearing. The defense did not challenge the fact that it was his intention to avoid returning. You're a very good representative of the government. There's no question about that. But the problem lies in these abominable, unconstitutional sentencing guidelines, you see. And now the Congress has got a couple of bills in there to lower these mandatory minimum sentences. Do you know that? So I predicted 30 years ago that the sentencing guidelines would collapse within five years. Well, that was not a very good prediction. But it's going to happen as soon as people wake up and realize how draconian they are, how they've taken discretion away in the real world and, in fact, from the sentencing judge and turned it over to the young prosecutors like you. And the whole system of criminal justice has been turned upside down on its head. In this particular case, Your Honor, I think that the record... Any other comments you'd like? Just one, and then I'll submit on the papers. But in this particular case, Your Honor, I think that the record of... You know, does he have a... I mean, he was found because the authorities spent time checking on phone They're trolling, trying to find people that watch this pornography, child pornography. And then they go after them. Now, refresh my memory. Has he committed any earlier crimes? No, Your Honor. This is the defendant's only criminal offense. First time in his life, huh? Yes, Your Honor. Okay, so we send him away to a prison. We're almost giving him a life sentence. And, you know, what happens to these people when they go into prison? They're not segregated in a prison. Word gets out about who they are. And, you know, their lives are in danger. So we have to think about those things, too. And maybe if we didn't have these guidelines, he may have been sent away for a year or two to some type of mental condition. And we don't do that anymore. We just lock people up. That's why we spend more money in this country on prisons than we do on education. What I know in this case, Your Honor, is that the transcript from the sentencing proceeding shows that Judge King did, in fact, take many of these things into consideration. Judge King, he's a wonderful man. But this wasn't called to his attention. I don't know. Somebody dropped the ball. Somebody dropped the ball about this finding. I don't know what he would have done then. But I've known him, I don't know, 30 years, more than that even. Couldn't get a finer person. But somehow the full picture wasn't presented to him. Well, Your Honor, actually there was discussion between defense counsel and the judge regarding defendant's mental state, regarding his emotional state. There was also extensive discussion about his condition. Well, they should have had maybe a report from a mental health expert on what his condition was, considering all these other things that he's gone through. And maybe that would have been helpful. I don't know. I wasn't there. I don't know what supports the lifetime supervised release other than a full employment act for probation officers. In this particular case, Your Honor, the record shows that Judge King took into consideration the aggravating factors in the case, including defendant's admission that he had these 42-inch, as in child-sized towels. Lifetime supervised release for every child pornography offender, even those who just had possession? I can't speak to every child pornography offender. That's the recommendation in the sentencing guidelines. That is the case. But in this case, Judge King was not just operating based on a blanket principle. He was looking at specific considerations for this defendant, one of which was that he had child-sized dolls that he had dressed in provocative costumes. Okay. So tell me, how does that link to proclivity to actually molest children? I don't see any expert report on that. Maybe he acts out with dolls, and that keeps him from acting out with children. There was no suggestion that he had acted out with children, Your Honor, and Judge King noted that on the record. I believe the concern was that that indicated some interest in acting out a sexual fantasy, and the concern was that by keeping him on supervised release, it would be possible to maintain some sense of what the defendant's conduct was like. But it's also worth noting that with supervised release, and this was also addressed on the record at the beginning of the hearing, although in the context of the alcohol conditions, it is certainly possible. If he complies well with supervised release and his first few years out of prison go uneventfully, the defendant can always move to terminate early or change the conditions of his supervised release. That was discussed at the hearing, as was the need to balance the term of supervised release with the amount of time he spent in custody. The question for this court is not necessarily whether as a policy matter, the sentencing guidelines should have a different policy regarding supervised release with sexual offenders, but whether or not the district court abused its discretion in imposing this sentence, and the district court did explain its reasons for it. He offered reasons, one of which was concern that the dolls indicated that the defendant was not merely viewing child pornography but also had interest in acting on certain fantasies that he had, and also that the district court recognized that these terms can be modified down the line and that there might be ways of in the long term adjusting supervised release if circumstances change. And under the circumstances, under the law of this circuit, that is the requirement for the district court is that it showed proper consideration of these factors. And there is certainly evidence in the record to suggest that both the sentence and the supervised release term were justified for this particular defendant. That in addition to the mitigating consideration of the death of his wife, there were a number of aggravating considerations, including the size of his collection and the fact that he had some kind of active activity associated with child pornography other than just viewing. And those are both things that were addressed on the record and that Judge King noted as being of particular concern. He also listened to a victim impact statement at the hearing, and there were victim impact statements included in the pretrial services report, I'm sorry, the pre-sentence report that were also taken into consideration by the court, the effect of this crime on the victims. In terms of sentencing, this was the kind of balancing that this Court has asked for. You're talking about the people who took the pictures. I'm talking about the people whose pictures were taken, Your Honor. I'm talking about the children depicted in the photos. Yes, the people who took the pictures of the children. That's what you're talking about. The information included in the PSR and in the sentencing regarded the victims, which were the children in the pictures, not the people who took the pictures of them. Yes, the children. But he didn't take the pictures of the children. No, Your Honor. Somebody else did for commercial purposes. Yes, and he didn't want me to look at them. And shouldn't those be the people we get our hands on? And, Your Honor, whenever we can, we do. Well, when's the last time you got one? I personally have not prosecuted one of them, and I can't speak for when was the last time the United States government did. No, I've seen a lot of possession cases, but I don't think I've ever seen one of the people who are actually creating the photographs. Are they done mostly abroad? Is that it? Many of these take place abroad. For the cases that we prosecute, many of the photographs, the children are located outside of our jurisdiction. I know that, for example, for this particular case, many of the children in the named series don't live in California, making it difficult, at least for the central district, to prosecute. I also know anecdotally of incidents in which we have investigated and prosecuted people who themselves were taking pictures and sharing them on peer-to-peer software, and through these kinds of message boards and websites, I have participated in interviews and proffer sessions with some of these defendants. I just personally have never prosecuted one of those cases. Couldn't the goals of sentencing have been accomplished by imposition of a 10-year period of supervised release rather than life? He's a first-time offender. The goals of sentencing could be accomplished by a full range of possible sentences, and that's why, although we have guidelines, there is also discretion available to the district court. In this particular case, perhaps also taking into consideration the defendant's age and, quite frankly, his poor behavior on supervision to that point, not just the cutting of the bracelet, but the fact that he had had several months' worth of difficulty complying with pretrial services rules and regulations. He demonstrated a certain amount of deception with regard to keeping the mailbox and the fact that his wife didn't know about the dolls, and there was just some concern stated in the PSR and recognized by the district court that this defendant may need more time on supervision. But again, even at the outset of the hearing, there was discussion of the fact that these things can be changed, and if this defendant, upon his release, complies very well and responds very well to community supervision, he can certainly make a motion and come in and ask for early termination. That is definitely an option. But in this particular case, the district court had some specific reasons for believing that it may be worthwhile to keep this man on supervision. Which way does his age cut? I have him as being 65. I'm sorry, could you say that again, please? Which way does his age cut? I have him as being 65. I think his age would count as something of a mitigating consideration with respect to his sentence, and the district court did take that into consideration. With respect to lifetime supervised release, it can, I think, cut either way, one way being that given, in light of his age, upon his release from prison, he's likely to be more likely to be compliant with most of the terms of supervised release. But on the other hand, the idea that a lifetime imposition of supervised release, if he was a 22-year-old defendant, might be saying this person is going to be on supervised release for the next 70 years. But for a defendant of his age, it would just inherently be a shorter period of time. I don't know. The district court didn't break that down that specifically, but he did take into consideration defendant's age, as well as his lack of compliance with pretrial supervision, as well as the concern about certain aggravating factors, and just wanting to make sure that this defendant was not put in a position where he might be able to actually harm or cause any further damage to the public, including watching child pornography, which is in itself a harmful activity. I would also just note for the record that Judge King did acknowledge the need to be able to provide mental health services for the defendant. That was one of the factors that he took into consideration in determining the length of sentence and is also a consideration in the imposition of the term supervised release, and he did actually address that on the record as well. Where is he going to get the mental health services? Well, there are programs provided through the Bureau of Prisons for sex offenders in custody. Judge King acknowledged that, as well as supervisees also have access to certain mental health services. This defendant was participating in mental health treatment on pretrial release until he began coming to sessions intoxicated and admitted that he had been driving under the influence of alcohol, at which point he was terminated from his mental health program, and that was also the point at which issues began to arise regarding his conduct on pretrial release, and it was ultimately his drinking problem that led to him being ordered detained prior to his wife dying. It was the fact that he was failing breathalyzers and failing to comply with terms restricting his drinking, all of which are valid things for Judge King to have taken into consideration in imposing a term of supervised release. And if there are no further questions. Well, CEO is 18 minutes and 33 seconds. Yes, sir. The next time I appear before you, Your Honor, I'd be happy to take that time from my allotted time. All right. Let's hope you'll have the time of 10 minutes. Thank you, Your Honors. Thank you, Your Honors. I just wanted to respond to one comment. The prosecutor said that the judge found that his mental state was not an excuse, and I think the record shows that, in fact, the judge said, I'm not going to make a finding on mental state. Because in the record, defense counsel says, after his wife passed away, it's tough to imagine what mental state that person has. And the district court's response, I don't disagree with you. In other words, the district court is saying, I don't know what his mental state was. And that's the same as the cases in which this Court and the Second Circuit have reversed the imposition of the enhanced sentence. Well, who represented him at sentencing? Chris Dibwad from our office. So I think in cases where the judge says, I don't know what the mental state was, this Court has reversed and the Second Circuit has reversed because the judge must make a specific finding of purpose of obstructing justice. And if there are no further questions, I'll leave my 10 seconds. Thank you, Your Honors. Thank you, counsel. Okay. On time, on budget. Thank you. Matter is submitted.
judges: Burrell, Pregerson, Wardlaw